# SONNENTHEIL v. CHRISTIAN MOERLEIN BREW-
## ING COMPANY.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE FIFTH
CIRCUIT.

No. 45.  Argued October 18, 19, 1898.—Decided January 3, 1899.

A suit against a marshal of the United States, for acts done in his official
capacity, is a suit arising under the laws of the United States; and the
joinder of another defendant, jurisdiction over whom is dependent upon
diversity of citizenship, does not deprive the marshal of rights he would
otherwise possess.

In an action assailing the validity of an assignment by an insolvent debtor
with preferences, if there be a conflict as to the words used, or if the
words themselves be ambiguous, the question of intent must be left to
the jury.

There is no class of cases which are more peculiarly within the province of
the jury than such as involve the existence of fraud.

Under the peculiar circumstances of this case, it was not error to submit to
the jury the question of fraud referred to in the opinion of the court.

THIS was an action at law, brought by Sonnentheil, trustee
under a deed of trust executed December 16, 1892, by Frei-
berg, Klein & Co., of Galveston, Texas, against the Christian
Moerlein Brewing Company, an attaching creditor, and one
Dickerson, whose Christian name is unknown, marshal of the
United States for the Eastern District of Texas, to recover
the value of a stock of goods seized by the marshal under
writs of attachment in favor of the Brewing Company.

Prior to December 16, 1892, Moses Freiberg, Sam Klein
and Joseph Seinsheimer were, under the firm name of Frei-
berg, Klein & Co., conducting a wholesale liquor and cigar
business at Galveston, Texas.  Having become embarrassed
and unable to meet their liabilities, upon the date above
named, they conveyed by deed of trust to the plaintiff Sonnen-
theil their stock of goods, together with their other property
and the debts due them, authorizing him to take immedi-
ate possession thereof, to sell the property and collect the
debts, and apply the proceeds to the payment of certain cred-
itors named in the deed of trust.  This deed was filed as a

VOL. CLXXII—26

chattel mortgage with the county clerk of Galveston County, Texas, on the day it was executed, and the plaintiff in error as trustee took immediate possession of the property therein conveyed.

Another deed of trust, dated December 17, was executed by the same parties to the same trustee to secure the same debts. This deed differed from the first only in inserting some words which had been erased from the first deed, in giving the trustee the power to compromise or sell the debts due the firm, and in binding the grantors, and each of them, in the name of the firm, to make such further assurances as to the property conveyed as would speed the execution of the trust.

Sonnentheil was holding the property in question under both of these deeds when, on December 23, 1892, a United States deputy marshal seized and took it from his possession against his protest. This seizure and dispossession were made by virtue of a writ of attachment from the Circuit Court for the Eastern District of Texas, in a suit for debt by the Brewing Company against Freiberg, Klein & Co., and the seizure was directed by an agent of the company. The Brewing Company was not secured in the deeds of trust. This suit was brought by Sonnentheil, the trustee, against the marshal and the Brewing Company to recover the value of the goods thus seized and taken from him.

The defendant demurred to the jurisdiction of the court; pleaded a general denial, and attacked the deeds of trust as void on their face, and as not having been accepted by the trustee or preferred creditors, and as having been made with the intent to defraud the unpreferred creditors of the firm, of which fraud they alleged the trustee and preferred creditors had knowledge. The specific objections urged to the deeds were that a provision allowing the trustee to compound and compromise doubtful debts due the makers was erased from the first deed before filing, as well as one authorizing each of the makers to make further assurances of title and transfer with the same effect as if made by each in person. That the makers of the first deed had, a short time prior to its execution, represented to two commercial agencies that

they were solvent, and had thereby deceived the defendant company into selling them a large amount of goods on credit; that the deeds conveyed property exceeding in value the debts secured; that the claims provided for in the deeds were also secured by solvent indorsers; that the makers had, not long before the execution of the first deed, conveyed to L. Fellman a large amount of real estate for a feigned consideration and in secret trust for themselves, and for the purpose of removing the same from the reach of their creditors, and had conveyed to others a large amount of assets to hold for their benefit; that they had made to H. Kempner a deed of trust to secure a pretended debt; that the makers of the deeds had, long prior to their execution, and whilst insolvent, entered into a conspiracy with L. Fellman, who was indorser on a large amount of Freiberg, Klein & Co.'s paper, and, with other persons, to remove the then present embarrassments of the firm and to continue business; and then, after enlarging their stock by purchases to a sufficient amount, to fail, and secure Fellman and other home creditors, and that the deeds of trust were the result of this conspiracy.

The plaintiff replied, denying the allegations of the answer, and alleging acceptance of the deed of trust before levy of the attachment.  Upon the trial it was shown that the deeds of trust under which Sonnentheil claimed were duly executed; that the first was duly filed for record, and that Sonnentheil was in possession of the property as trustee at the time the second deed was executed; that the debts preferred in the deeds amounted to about $140,000, all of which, except $10,000, were secured by the accommodation indorsement of Fellman & Grumbach, and none was secured otherwise; that several of the creditors had accepted the deed of trust before the levy of the attachment, and some of the secured debts were paid thereafter.

The jury returned a verdict for the defendants, whereupon the case was taken by the plaintiff to the Circuit Court of Appeals, and the judgment of the court below was there affirmed.  41 U. S. App. 491.  Thereupon the plaintiff sued out a writ of error from this court.

*Mr. A. H. Willie* and *Mr. J. M. Wilson* for plaintiff in error.

*Mr. F. Charles Hume* for defendants in error.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

1. At the last term of this court motion was made to dismiss the writ of error upon the ground that under section 6 of the act of Congress of March 3, 1891, establishing the Circuit Courts of Appeals, the judgment of the Court of Appeals affirming the judgment of the Circuit Court was final. By this section the judgments or decrees of the Circuit Courts of Appeals shall be final in all cases in which the jurisdiction depends entirely upon the opposite parties to the suit being aliens and citizens of the United States, or citizens of different States. In this case the plaintiff Sonnentheil was a citizen of the State of Texas; the defendant Brewing Company was a corporation created by the laws of Ohio, and a citizen of that State, and Dickerson a citizen of the State of Texas; but it also appears upon the face of the original petition that Dickerson was marshal of the United States for the Eastern District of Texas, and that he made the seizure of the goods in question through his deputy, John H. Whalen, and under a writ of attachment sued out by the Brewing Company against Freiberg, Klein & Co. as defendants. It thus appears that the jurisdiction of the Circuit Court did not depend entirely upon diversity of citizenship between the plaintiff and the Brewing Company, but upon the fact that one of the defendants was marshal of the United States, and was acting in that capacity when he seized the goods in question.

Had the action been brought against the marshal alone there can be no doubt that the Circuit Court would have had jurisdiction of the case as one arising under the Constitution and laws of the United States. *Feibelmann* v. *Packard,* 109 U. S. 421; *Bachrack* v. *Norton,* 132 U. S. 337. It is true that in these cases the action was against the marshal and

the sureties upon his bond, but there is no difference in principle. The right of action in both cases is given by the laws of the United States, which make the marshal responsible for trespasses committed by him in his official character. *Bock* v. *Perkins*, 139 U. S. 628; *Buck* v. *Colbath*, 3 Wall. 334; *Texas & Pacific Railway* v. *Cox*, 145 U. S. 593. If suits against a bank or railways chartered by Congress are suits arising under the laws of the United States, as was held in *Osborn* v. *U. S. Bank*, 9 Wheat. 738, and in *Pacific Railway Removal cases*, 115 U. S. 1, with even greater reason must it be considered that a suit against a marshal of the United States for acts done in his official capacity falls within the same category.

The joinder of another defendant, jurisdiction over whom was dependent upon diversity of citizenship, deprived the marshal of no right he otherwise would have possessed. Though there are two defendants, the case was *one*, and that a case in which the jurisdiction was not dependent *entirely* upon the opposite parties to the suit being citizens of different States. Had two suits been brought, one of them would undoubtedly have been dependent upon citizenship, and the other a case arising under the laws of the United States. But as the plaintiff chose to join both defendants in a single action, jurisdiction of that action was not *wholly* dependent upon either consideration. Had the jurisdiction of the Circuit Court been originally invoked solely upon the ground of diversity of citizenship as applied to the Brewing Company, the case would have fallen within the *Colorado Central Mining Company* v. *Turck*, 150 U. S. 138, but as the original petition declared against Dickerson as marshal, for an official act as such, that case has no application.

The record contains twenty-three assignments of error, most of which it will be unnecessary to consider separately. For the purposes of this decision they are reducible to three.

2. Several of these assignments are based upon an alleged error of the court in submitting to the jury the question whether the deed of trust was accepted by any of the preferred creditors before the levy of the attachment.

Under the laws of Texas it is conceded that the instruments in question were deeds of trust, in the nature of chattel mortgages, under which the proceeds of the property sold were, after paying expenses, to be appropriated to the payment of the debts enumerated in the deeds, and any surplus remaining to be turned over to the makers of the instrument, and that such a deed of trust must be accepted by some *bona fide* creditor secured therein in order to give it effect.

In this connection the plaintiff requested the court to charge that " the deed of trust in question in this case is valid upon its face, and the debts secured therein are shown to have been, at the time of its execution, *bona fide* debts of the makers, Freiberg, Klein & Co. It has been further shown that some of the creditors named therein accepted said deed before the levy of the attachment of the Moerlein Brewing Company, and it has not been shown that at the time of such acceptance such creditors had knowledge of any fraudulent intent in the making of such deed, or had any cause to suspect that the same was made with fraudulent intent."

This the court refused, and in lieu thereof charged that the deed, upon its face, was a legal instrument; that it differed under the laws of Texas from an assignment in the fact that an assignment presumes that " all the creditors named accepted it. In order to make a deed of trust operative it is necessary that the parties for whose benefit it is made should accept it. It is not necessary that the acceptance should be in writing, nor is there any particular form of acceptance. By the term ' acceptance ' it is simply meant that when they understand what has been done, they consent to it; they agree to it, no matter in what form that may be done. Anything that shows that after being informed of what has been done, that with a knowledge of these facts, they assent to it, or they agree to it, constitutes and is, in fact, an acceptance. . . . I hold as a matter of law that if you find as a matter of fact that if *any creditor* accepted the terms of this instrument before the levy of the attachment, and you do not find that debt to be infected with fraud, as I shall hereafter instruct you, in that event you are instructed that the entire property named in this deed

passed to the trustee, and in this action he may recover for whatever it is shown the property was worth at the time and place it was taken."

To the charge as thus given exception was taken upon the ground that it left the question of the acceptance of the deed of trust by the beneficiaries to the determination of the jury, when such acceptance was a question of law which should have been determined by the court; that the entire and un-contradicted proof showed that before the levy of the attach-ment, the deed of trust had been accepted by a portion of the beneficiaries named therein, and also by the trustee, and that there was no question of fact for the jury to determine.

The evidence upon this point was that the deed was made on December 16, 1892, and filed in the county clerk's office the same night, and that the goods were seized by the marshal under the attachment of the Brewing Company on December 23; that one Fry was one of the creditors secured in the deed; that he was informed of the deed of trust the night it was executed, and that he was secured in it. He answered that it was all right, and repeated the same thing next day.

Of the firm of Adoue & Lobit, who were also *bona fide* cred-itors secured by the deed, Adoue testified as follows: "The assignee, Sonnentheil, came to our office in the morning before twelve o'clock and told me that we were one of the secured creditors in the trust deed, and he would expect me to give him my assistance in the management of the business. I said I would, and for that purpose he would call a meeting later on. That was my notice of the failure. I answered him in a few words. Cannot exactly recall them. I said it was all right; very glad he was assignee; hoped we would get our money back. I attended two or three meetings. . . . I did more than indicate my acceptance of the security that was given me by the deed of trust. We acted there as if it were our own property. We were discussing how it was best to dispose of it so as to get our money out of it; that was my idea."

Lobit, his partner, testified as follows: "When I learned of the failure I also learned that the notes which we held were secured by the deed of trust. This I also learned from the

newspaper. I also talked with Moses Freiberg a few days after the deed of trust was made. He regretted the failure and was sorry. I told him that I was satisfied, inasmuch as they had protected us in the deed of trust, and that I supposed they had done the best they could, and we were satisfied with it."

One Marx, the Galveston agent of S. A. Walker, a creditor of the firm, also testified : " I learned of it next morning after it occurred. Did not know of it before. I talked to Fellman about the deed of trust. He was endorser of Walker's paper; did not talk particularly to any member of the firm of Freiberg, Klein & Co.; I accepted under the deed of trust, probably the next day, I think to Joe Seinsheimer. I assented to the deed of trust securing Walker. I was authorized to do so for Walker."

Of course, if the acceptance had been in writing, the construction of such writing would have been a question for the court. With reference to parol understandings, the rule is that if there be any conflict as to the words used, or if the words themselves be ambiguous, the question of intent must be left to the jury. Notwithstanding the testimony of these witnesses was so positive to the effect that they accepted the trust, we are of opinion that it was not improper to submit the question to the jury. In its charge the court instructed the jury that the creditors who accepted the deed of trust must themselves be free from the taint of fraud, and the question of fraud was so connected with that of acceptance that it was possible for the jury to have found that the accepting creditors had knowledge of the fraud at the time of their acceptance. They were all apparently interested in sustaining the deed, and in denying all knowledge of a fraudulent intent, and while the jury has no right to arbitrarily disregard the positive testimony of unimpeached and uncontradicted witnesses, *Lomer* v. *Meeker*, 25 N. Y. 361, 363; *Elwood* v. *Western Union Tel. Co.* 45 N. Y. 549, 553, the very courts that lay down this rule qualify it by saying the mere fact that the witness is interested in the result of the suit is deemed sufficient to require the credibility of his testimony to be submitted to the jury as a question of fact.

*Munoz* v. *Wilson*, 111 N. Y. 295, 300; *Dean* v. *Metropolitan Elevated Railway*, 119 N. Y. 540, 550; *Canajoharie Bank* v. *Diefendorf*, 123 N. Y. 191, 200; *Volkmar* v. *Manhattan Railway*, 134 N. Y. 418, 422; *Rumsey* v. *Boutwell*, 61 Hun, 165, 168; *Roseberry* v. *Nixon*, 58 Hun, 121; *Posthoff* v. *Schreiber*, 47 Hun, 593, 598.

3. Upon the trial it was insisted that the deeds were void upon their face, but the court held them to be valid, and we see no reason to question the correctness of its conclusion. Upon the question of actual fraud, which was the main issue in the case, the court charged the jury as follows: "If you find from the evidence that any one creditor had accepted the deed of trust before the levy of attachment, and that such creditor was not guilty of fraud himself and was not aware of fraud in the makers of said instrument, or was not in possession of such information as would have put a reasonably prudent person upon inquiry, you will find for the plaintiff; but on the other hand, if you find that the creditor or creditors had accepted said deed of trust before the levy of said attachment, and were either guilty of fraud themselves or were possessed of information that would have led a reasonably prudent person to infer that fraud did exist, you will find for the defendant."

This instruction was excepted to by the plaintiff upon the ground that it left to the jury the fact whether any of the creditors had knowledge of the fraudulent intent — if any there were — in the making of the deed of trust, when there was no evidence whatsoever to show that the beneficiaries who accepted said deed of trust either had knowledge of any such fraudulent intent — if it existed — or that they were put upon inquiry as to such fraudulent intent by any circumstances which had been given in evidence; but, on the contrary, the uncontradicted evidence was that they had no knowledge of any such fraud, if any there was, or of any fact that would have put them upon inquiry with reference to the same.

With regard to the question of fraud in fact there was considerable testimony, but it was insisted by the plaintiff that,

so far as concerned the creditors who accepted the deed of trust, there was not a scintilla of evidence tending to show either direct knowledge of the fraud, or such information as would put a reasonably prudent person upon inquiry as to the existence of such fraud.

It may be said in general that there is no class of cases which are more peculiarly within the province of the jury than such as involve the existence of fraud. So much depends upon the character of the business transacted by the insolvent firm, the circumstances under which the deeds are executed, the relation of the parties to one another and to the preferred creditors, the manner in which the business is subsequently conducted, the opportunities the preferred creditors had of informing themselves of the facts, that it is rarely safe to withdraw the question from the jury. Parties contemplating a fraud frequently pursue such devious courses to conceal their designs, and resort to such subtle practices to mislead their unsecured creditors, that the fraud becomes impossible to detect, unless the door be swung wide open for the admission of all testimony having any possible bearing upon the question. Facts which to the court might seem of no pertinence and be rejected as having no legal tendency to show knowledge of the fraud, might be considered by the jury as significant and indicative of a guilty participation. Even negative evidence may sometimes have a positive value.

The testimony in this case indicates that as early as February, 1891, it had been discovered by Freiberg that the firm had lost considerable sums of money through Seinsheimer, one of the partners, and was in an embarrassed condition; and arrangements were made with the principal creditor of the firm, a kinsman of Freiberg, by which it was hoped to extricate themselves. This proving ineffectual, a meeting was called at the residence of one Fellman, in Galveston, which was attended by the members of the firm and by Fellman, Kempner and Grumbach, indorsers for the firm. Seinsheimer and Grumbach married sisters and were sons in law of Fellman; Kempner was a brother in law of Seinsheimer. At the time of this meeting Fellman and Grumbach, who were part-

ners in the dry goods business, were indorsers for Freiberg, Klein & Co. to the extent of $135,000. At this and other meetings which were held, the question of the solvency of the firm, and the means which should be used to protect it from failure, were considered, and arrangements were made to reduce their debts so that they could continue business. After these meetings the firm continued business as before, buying and selling goods for cash and upon credit. At these meetings it was determined that the firm should endeavor to carry on their business, but if it had to fail that Fellman should be protected at all hazards. There was also evidence to the effect that a short time prior to the failure Fellman promised to buy out their goods and let them carry on the business in his name. The testimony also tended to show that before making the deeds, a conveyance of land for something less than its value was made by the firm to Fellman for cash paid by him. Also that Seinsheimer, one of said firm, had kept from the trustee some of the bills receivable by the firm, but that the trustee, upon finding this out, had made him turn the bills over to him.

In March, 1891, a request for a report of the financial condition of the firm by a commercial agency was answered by a statement, made under the direction of Seinsheimer, showing that the assets of the firm exceeded its liabilities by $200,000, when in truth the firm was insolvent. The business of the firm was continued by the purchase and sale of goods, and the Fellman indorsements were continued by extensions and renewals.

In February, 1892, it was discovered that the firm was hopelessly insolvent, but another call from the commercial agencies for an annual report was again met by a false statement, showing assets in excess of liabilities of more than $200,000. Fellman, Grumbach and Kempner had full notice from members of the firm of all these matters.

In the summer of 1892 the failure of the firm became evident, and goods were purchased and placed in stock, with a knowledge that they could not be paid for. The credits of the firm were restricted; in some instances entirely cut off, and rumors of its insolvency circulated throughout the com-

munity. The dangerous condition of the firm became a matter of discussion among business men in Galveston, and inquiries continued to be made from abroad of the local commercial agencies as to their solvency. A demand was again made by a commercial agency in September, 1892, at the instance of the defendant Brewing Company, and was answered by another statement, showing an excess of $200,000 over all liabilities; and the Brewing Company was thereby induced to extend a further credit to the firm.

Notwithstanding the apparently desperate condition of the firm, during the months of September, October and November and up to the 16th day of December, 1892, the day of its failure, the firm made large purchases upon credit, and, early in December, Fellman, who was then in New York, was called home to participate in and direct the business. He came immediately and assumed the practical superintendence of affairs. Upon consultation with attorneys, he had the original purpose of the firm to transfer its property directly to him changed to a trust deed in favor of the creditors whose paper he had endorsed. At his request Sonnentheil, a relative of his wife, was employed as trustee, at a salary of $150 per month. He had been a business man in Galveston, but was without knowledge or experience in the particular business for which he was selected. A deed of trust was thereupon executed to Sonnentheil, as trustee, to secure home creditors and two who were not home creditors, already secured, save in a few and relatively unimportant instances, by the indorsements of Fellman and Grumbach. The property covered by the deed of trust, which exceeded in value the secured debts by about $75,000, was turned over to the trustee in pursuance of an arrangement between the firm and Fellman that the business should be continued either in Fellman's name or in the name of some one else, until a settlement could be obtained, when it was to revert to the firm.

The possession of the trustee consisted in his having the key to the storehouse in which the goods were situated, and in attending at the store some hours every day. He signed all the letters and checks, and kept control of the general

cash.  The three members of the firm were each employed at a salary of $300 per month, Seinsheimer as correspondent. He also had the keeping of the daily cash receipts.  The other two acted as collectors.  All the employés of the firm, including the drummers, were retained in their respective positions, and at their former salaries.  The firm's sign, prominently displayed over the door of the storehouse, was not removed. The business (exclusive of the purchase of goods) was conducted, with the consent of the beneficiaries, in the usual way by selling in small parcels, sometimes on credit and sometimes for cash, to the regular customers of the firm.  Such customers consisted largely of barrooms throughout the State of Texas, and the purpose of the trustee was in accordance with the wish of the beneficiaries to keep these barrooms going in the usual way by selling them goods on time, so as not to interrupt their usual business, and gradually collect what they owed.

The books of the firm, the trustee claimed, were in his charge, but he admitted that all entries made in the books after the date of the failure were made therein by Seinsheimer, and not under his (the trustee's) direction, but in his capacity as a member of the firm.  In fact, he claimed to be ignorant of such entries, although they showed that the books had been regularly kept just as though no change had been made in the ownership of the property.

While there is nothing in all this which proves either direct knowledge of the fraud to the accepting creditors, or positive knowledge of facts which necessarily put them upon inquiry, there is a strong probability that these creditors, who were all business men resident in Galveston, were possessed of the same information that others had regarding the failing condition of the firm.  As one of the witnesses stated : " Rumors were afloat that they were slow in payments, owing largely to banks and individuals ; credit refused them in some quarters, and generally that their business was not healthful.  Inquiries as to the financial standing of the firm came from Northern and Eastern cities, local banks and firms.  There were rumors in Galveston, general in their character and dis-

cussed among brokers, banks and merchants." It is scarcely possible that these rumors could have escaped the ears of their local creditors. It is not improbable that the peculiar relationship of the firm to Fellman was known to these creditors, as well as the fact that the assignment was intended primarily to protect Fellman, and secondarily to secure a settlement with the creditors upon terms favorable to the firm, and the subsequent return of the property to them. It is by no means impossible that they knew that the firm were making large purchases of goods on credit just before their assignment; that false representations had been made to commercial agencies of their financial standing; that the debts secured by the deed of trust were already secured by Fellman's indorsement; that the firm still remained in open possession of the stock and practically retained direction of the business, and that to the public at large there was no apparent change in its conduct or headship. Under the peculiar circumstances of this case it was not error to submit this question to the jury, and there is no criticism to make of the charge of the court in that particular. Indeed, in another case arising out of the same failure the Supreme Court of Texas held that the question of fraud was properly left to the jury. *Sonnentheil* v. *Texas Guaranty & Trust Co.*, 30 S. W. Rep. 945.

4. Error is also assigned in admitting the statement of one Werner as to interviews had between him and Freiberg and Seinsheimer subsequent to the execution of the deeds of trust, in which Freiberg is said to have asked Werner, as agent of the Moerlein Brewing Company, to give him, Freiberg, the agency for the sale of the beer, saying that "after they got a settlement they would go right ahead; the beer would not change hands at all; go to the same customers; and that the firm was in such a shape that they had to fail." This evidence was objected to upon the ground that it related to statements made by the firm after the execution of the deeds of trust, and was not known or assented to by the trustee or the beneficiaries of the trust deed, and was incompetent to affect their interests.

Werner, the witness, was agent for the Brewing Company,

living in Cincinnati.   Hearing of the failure, he left home and reached Galveston three or four days after the assignment. He went immediately to the office, and met Seinsheimer and Freiberg.   At this interview Freiberg made the statement in question.   There is no doubt of the general proposition laid down by this court in *Winchester & Partridge Mfg. Co.* v. *Creary*, 116 U. S. 161, that in an action by the vendee of personal property against an officer attaching it as the property of the vendor, declarations of the vendor to a third party, made after the delivery of the property, are inadmissible to show fraud or conspiracy to defraud in the sale, unless the alleged collusion be established by independent evidence, and the declarations fairly form part of the *res gestæ*.

The same question was again considered in *Jones* v. *Simpson*, 116 U. S. 609, in which declarations of the vendor made after delivery of the property to the vendee, but on the same day and fairly part of the *res gestæ*, were held to be admissible to show intent to defraud the vendor's creditors by the sale, it being also shown by independent evidence that the vendee shared the intent to defraud with the vendor.

In the case under consideration there was independent evidence that the vendors, Freiberg, Klein & Co., and the vendee, Sonnentheil, were engaged in a common purpose to defraud the creditors of the vendors, and the declarations in question were not mere admissions of what had already taken place, but were propositions for a further continuance of business with the Brewing Company, upon a basis which indicated that after they had obtained a settlement with their creditors, they would assume their ownership and charge of the stock and continue business as they had done before.   While the propriety of admitting these declarations as against the plaintiff Sonnentheil and the secured creditors may be open to some doubt, it is entirely clear that they were admissible against Freiberg, Klein & Co., and the rights of the secured creditors were so carefully guarded in the charge to the jury that we think no harm could have resulted from allowing the jury to consider them.

We have examined the remaining assignments of error, of

which there are a large number, but the disposition we have made of the others renders it unnecessary to consider them. While the propriety of some of the rulings may admit of doubt, the objections made were extremely technical in their character, and the majority of the court are of opinion that no error was committed prejudicial to the plaintiff and to the secured creditors, and that the judgment of the Circuit Court of Appeals must therefore be

*Affirmed.*