**STONE v. STONE.**

**No. 8279.**

United States Court of Appeals for the District of Columbia.

Decided May 24, 1943.

Mr. Burton A. McGann, of Washington D. C., for appellant.

No appearance was entered, nor brief filed, for appellee.

Before GRONER, Chief Justice, and MILLER and EDGERTON, Associate Justices.

MILLER, Associate Justice.

This case constitutes another, in the long list of examples, which demonstrate the need for uniform marriage and divorce laws.[1] The District of Columbia has no

---

[1] Cf. Williams v. North Carolina, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. —; Haddock v. Haddock, 201 U.S. 562, 26 S. Ct. 525, 50 L.Ed. 867, 5 Ann.Cas. 1. Bingham, In the Matter of Haddock v. Haddock, 21 Corn.L.Q. 393; Beale, Haddock Revisited, 39 Harv.L.Rev. 417, 429; Comment, Uniformity and the Recognition of Ex Parte Divorces, 44 Yale L.J. 488; Strahorn and Reiblich, The Haddock Case Overruled—The Future of Interstate Divorce, 7 Md.L.Rev. 29, 67; Wise, Shall Congress Be Given Power to Establish Uniform Laws Upon the Subject of Divorce Among the States of the Union, 70 Cent.L.J. 93; Freund, Uniform Marriage and Divorce Legislation, 21 Case & Comm. 7. See, Uniform Acts Drafted and Adopted by the National Conference of Commissioners on Uniform State Laws and Approved by the American Bar Association: Marriage and Mar-

requirement for medical examination prior to marriage; Virginia's law requires examination; provides that the examiner shall inform both parties if he finds that either has syphilis; but permits marriage, nevertheless.[2] Effia Tyler and Floyd K. Stone, a waiter, were married in Alexandria, Virginia, on May 23, 1941. No children were born of the marriage. In her complaint appellant alleged that she entered into the marriage contract in good faith, believing that appellee was entitled, under the law, to contract a valid marriage with her; that he, intending to deceive her, and thus to secure her consent, wilfully, deliberately, and purposely concealed from her the fact that he was suffering from syphilis, well knowing that, if the fact had been disclosed to her, she would not have consented to the marriage; that her consent was not voluntarily given, but was procured by his fraudulent concealment; that approximately three weeks after the marriage she discovered his diseased condition; whereupon, the couple separated, and have not since lived together. The complaint was filed less than three months after the marriage. It asked annulment of the marriage on the ground of fraud. Although appellee was properly served, he failed to answer. An attorney was appointed by the court to represent him;[3] but he failed to cooperate with the attorney, who, thereupon, filed an answer in his own name, putting appellant to her proof. The cause came on for hearing on March 2, 1942.

At that time, the facts alleged were proved by competent evidence, and without contradiction. There is no doubt that appellee was suffering with syphilis at the time of the marriage; there is no contention that he revealed that fact to appellant. Her testimony concerning the bridegroom's behavior, his concealment and her discovery of evidence, her seeking advice of friends, and being advised that her husband had a "bed disease," the immediate separation and speedy institution of suit for annulment, are all highly persuasive that she was unaware of her husband's affliction until after marriage; hence, that fraud was practiced upon her.

On March 16, 1942, the trial judge sent to appellant's attorney the following letter: "My recollection is that at the conclusion of the trial in this case I requested that you furnish me with a copy of the Virginia law requiring physical examination of parties about to be married. I also wanted to know what the doctor who made the blood test had to say about plaintiff's testimony that she had not been advised as to the result of the blood test of her prospective husband. I have just had an opportunity to read the brief which you filed a short time ago in the case. My present view is that section 1073 of the District Code does not apply to a conversation between the doctor and Mrs. Stone. I shall be glad to have whatever you can furnish me as promptly as possible."

On April 15, 1942, the trial judge signed the following memorandum of opinion: "Plaintiff and defendant were married in Alexandria, Virginia, on May 23, 1941; they separated in a few days. Plaintiff sues to annul the marriage on the ground that defendant wilfully concealed from her the fact that he had contracted syphillis. Under sections 5073a(a) (b) of the 1940 Cumulative Supplement to the Virginia Code of 1936 it is provided that a blood test be taken of each party by a physician before the issuance of a marriage certificate and that the result of the examination—if either indicates presence of syphillis—be declared to both parties to the marriage before the ceremony of marriage is performed. An examination of the blood of defendant made at the Alexandria Hospital Laboratory on May 23, 1941 showed 'Blood Serology', Eagle Positive, Kahn 2+.' The license was issued and the marriage ceremony was performed on that day. Plaintiff testified that the doctor who made the blood tests of herself and defendant told her that there was no reason why she could not marry. The statute in question makes it the duty of the physician to disclose to the man and woman the result of his test of each one of them where the presence of syphillis is found. The attorney for plaintiff has declined to call as a witness the doctor who made the examination in this case. I think the presumption [sic] is that he performed the duty imposed upon him in the statute. Therefore I am unwilling upon the foregoing state of the evidence to find that plaintiff was deceived. The complaint will be dismissed." Then

---

riage License Act (1911); Marriage Evasion Act (1912); Divorce Jurisdiction Act (1930); Desertion and Non-Support Act (1910); Illegitimacy Act (1922).

[2] Virginia Code 1942, Title 45, Ch. 204, § 5073a.

[3] D.C.Code 1940, § 16—418; D.C.Code 1924, § 982.

followed the order of dismissal and this appeal.

 It is the purpose of the law of the District to require caution in the granting of uncontested divorces,[4] and to prevent the granting of default decrees, without proof.[5] But it is just as much the purpose of the law that marriages procured by fraud may be set aside, at the instance of the innocent party.[6] No consideration of public policy requires that an innocent woman must live in marital relationship with a syphilitic husband, under the circumstances of the present case. Except for injection, into the trial, of the Virginia practice, and of the presumption of law supposed to result therefrom, appellant had satisfied, fully, the requirements of the law, and was entitled to a decree of dissolution of marriage, because of fraud in its procurement, by her husband's concealment of the fact that he was suffering with a venereal disease.[7]

 Considering the number of cases in which such blood tests are given, under the Virginia law, it is probable that, if the examiner had been available, he would have testified to lack of recollection of these parties, but would have stated that he complied with the law in all cases. However, there was no such evidence in this case; and, at most, what the trial judge had to rely upon was that, as a matter of common experience, public officials usually do their duty. In an action which challenges the conduct of a public officer, a presumption of law is indulged in his favor that his official duties were properly performed. Like other such presumptions, it disappears so soon as substantial countervailing evidence is introduced.[8] On the other hand, the basic fact that public officials usually do their duty— and, in this case, with the usual conscientiousness and regularity of physicians— has and continues to have, throughout the action, that quality and quantity of probative value to which it is entitled, entirely apart from any presumption; just as is true of any other fact which is based upon common experience.[9] As Wigmore says of such "presumptions of fact" as that with which we are here concerned: " 'They are, in truth but mere arguments,' and 'depend upon their own natural force and efficacy in generating belief or conviction in the mind.' They have no significance so far as affects the duty of one or the other party to produce evidence, because there is no rule of law attached to them, and the jury may give to them whatever force or weight it thinks best,—just as it may to other evidence. There may be a preliminary question whether the evidence is relevant and admissible as having any probative value at all; but, *once it is admitted,* the probative strength of the evidence is for the jury to consider." [Italics supplied.]

In the present case there was, in fact, no evidence admitted, merely a request by the trial judge that certain evidence be produced. But, in any event, the probability, based upon common experience, that the examining physician did tell appellant of appellee's condition—when judged upon its own merits, on the record, and under the circumstances of the present case—was entitled to very little weight.[10] In its memorandum opinion the trial court stated: "Plaintiff testified that the doctor who made the blood tests of herself and defendant told her that there was no reason why she could not marry." It will be noted that this statement did not say whether the doctor told her anything about the condition of appellee. The record shows that appellant's test was performed on May 22, 1941, while appellee's test was not performed until the following day, May 23, the day upon which the marriage was celebrated. It seems highly probable, therefore, that the busy examining physician did not even see the two parties together. This was a subject which might have been explored by the trial judge or by appellee's attorney. The record fails

[4] D.C.Code 1940, § 16—418; D.C.Code 1924, § 982.

[5] D.C.Code 1940, § 16—419; D.C.Code 1924, § 964.

[6] D.C.Code 1940, § 30—103.

[7] See: Svenson v. Svenson, 178 N.Y. 54, 70 N.E. 120; Sobol v. Sobol, 88 Misc. 277, 150 N.Y.S. 248 (tuberculosis); C — v. C —, 158 Wis. 301, 148 N.W. 865, 5 A. L.R. 1013; Watson v. Watson, Mo.App., 143 S.W.2d 349; Ryder v. Ryder, 66 Vt. 158, 28 A. 1029, 44 Am.St.Rep. 833; Hooe v. Hooe, 122 Ky. 590, 92 S.W. 317,

[5] L.R.A.,N.S., 729, 13 Ann.Cas. 214; Wilson v. Wilson, 16 R.I. 122, 13 A. 102.

[8] New York Life Ins. Co. v. Gamer, 303 U.S. 161, 170, 58 S.Ct. 500, 82 L.Ed. 726, 114 A.L.R. 1218; Rosenberg v. Murray, 73 App.D.C. 67, 116 F.2d 552.

[9] 9 Wigmore, Evidence (1940 ed.) § 2491; Morgan, in A. L. I. Model Code of Evidence, p. 55.

[10] See, generally, 9 Wigmore, Evidence (1940 ed.) § 2534; Rosenberg v. Murray, 73 App.D.C. 67, 116 F.2d 552.

to reveal the slightest effort to explore the subject further in this manner, or thus to lay a foundation for impeachment of appellant's uncontradicted testimony that she was ignorant of appellee's condition.[11] But it does appear that appellant acted promptly, as soon as she ascertained the truth; and refused thereafter to continue the marital status. This, together with the official determination that appellee had syphilis, and other disinterested evidence of surrounding physical facts, constituted corroboration, which gave added weight to the inherent probability of her testimony.[12] It will be noted in this respect that the trial court made no finding that fraud was not established. It indicated, instead, an unwillingness to find fraud, apparently upon the sole basis of an assumed presumption of law, and of counsel's failure to produce the examining physician.

We see no reason for penalizing appellant because of failure to produce the examining physician. On this appeal, the trial judge approved her petition to proceed in forma pauperis. Under such circumstances, it is easy to understand her hesitation to incur the expense of bringing a witness from another jurisdiction, especially when the case was uncontested and the allegations of fraud undisputed.[13] The witness was equally available to appellee's counsel; and, if subject to subpoena, the trial judge who desired his testimony had power to produce him. Moreover, appellant insisted at the trial, and insists on this appeal, that the testimony of the doctor was privileged. The trial judge expressed a tentative opinion that it was not. The Virginia Code provides, expressly, that [1] the statement which the physician is required to make shall be transmitted to the State Department of Health;[14] and [2] such statements shall "constitute and be treated as confidential records of the Department of Health." [15] There would seem to be at least a debatable issue.[16] In any event, appellant does not come under the rule that a party who has it peculiarly within his power to produce a witness, by failing to do so, creates an inference that if the testimony were produced it would be unfavorable. Appellant had no peculiar power over a representative of the Virginia State Department of Health, and we think that no unfavorable implication can be drawn from her failure to produce him.[17]

In this case there was positive testimony, uncontradicted, and not inherently improbable. Neither a jury nor a judge is at liberty to disregard such evidence.[18] "* * * where the testimony is all one way, and is not immaterial, irrelevant, improbable, inconsistent, contradicted, or discredited, such testimony cannot be disregarded or ignored by judge or jury, and if one or the other makes a finding which is contrary to such evidence, or which is not supported by it, an error results, for which the verdict or decision, if reviewable, must be set aside. To hold otherwise would vest triers of the facts in cases subject to review with authority to disregard the rules of evidence which safeguard the liberty and estate of the citizen. Kelly v. Jackson, 6 Pet. 622, 631, 8 L.Ed. 523." [19]

Reversed.

EDGERTON, Associate Justice.

I agree that the presumption of official regularity was entitled to no artificial weight after appellant had testified. But the usual conscientiousness and regularity of physicians made appellant's testimony

---

[11] Chesapeake & Ohio R. v. Martin, 283 U.S. 209, 216, 51 S.Ct. 453, 456, 75 L.Ed. 983: "We recognize the general rule, of course, as stated by both courts below, that the question of the credibility of witnesses is one for the jury alone; but this does not mean that the jury is at liberty, under the guise of passing upon the credibility of a witness, to disregard his testimony, when from no reasonable point of view is it open to doubt. The complete testimony of the agent in this case appears in the record. A reading of it discloses no lack of candor on his part. It was not shaken by cross-examination; indeed, upon this point, there was no cross-examination. Its accuracy was not controverted by proof or circumstance, directly or inferentially; and it is diffi- cult to see why, if inaccurate, it readily could not have been shown to be so. The witness was not impeached; and there is nothing in the record which reflects unfavorably upon his credibility."

[12] Id., 283 U.S. at page 215, 51 S.Ct. 453, 75 L.Ed. 983.

[13] See Graves v. United States, 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021.

[14] (1942) Title 45, ch. 204, § 5073a (b).

[15] Id., § 5073a (e).

[16] See D.C.Code 1940, § 14—308.

[17] 2 Wigmore, Evidence (3d ed.) § 286.

[18] Walker v. Warner, 31 App.D.C. 76, 87.

[19] George v. Capital Traction Co., 54 App.D.C. 144, 147, 295 F. 965, 968.

more or less improbable; and she was an interested witness.[1] The District Court, in my opinion, was free to give so much inartificial weight to the probability of the doctor's doing his duty, and so little weight to appellant's testimony, as to find that her burden of proof was not discharged.[2] However, I think we may infer from the District Court's memorandum that, had it not given artificial weight to the presumption of official regularity, it would in fact have found that appellant married in ignorance of her husband's condition. Therefore it would be a useless formality to remand the case for new findings, and I concur in the result which the majority of this court have reached.

[1] Cf. Sonnentheil v. Christian Moerlein Brewing Co., 172 U.S. 401, 408, 19 S.Ct. 233, 43 L.Ed. 492.

[2] Rosenberg v. Murray, 73 App.D.C. 67, 116 F.2d 552, is not to the contrary. It is one thing to say, as that case did in effect, that unauthorized use of automobiles is not so uncommon as to sustain, in the face of adverse testimony, a plaintiff's burden of proving that use was authorized; it would be quite another thing to say that gratuitous failure of physicians to do their professional and statutory duty is not so uncommon as to prevent adverse testimony from discharging a plaintiff's burden of proving such failure.