Thaddeus G. BENTON, Appellant,

v.

Francis M. BLAIR, Appellee.

No. 15629.

United States Court of Appeals
Fifth Circuit.

Dec. 16, 1955.

As Amended on Motion to Enlarge
Opinion Jan. 16, 1956.

Thaddeus G. Benton, McNally & Krieger, New York City, by Lawrence W. Krieger, New York City, of counsel, for appellant.

David T. Searls, Dan C. Arnold, Vinson, Elkins, Weems & Searls, Houston, Tex., for appellee, Francis M. Blair.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

Upon the close of the plaintiff's case below, the trial court, sitting without a jury, granted judgment for the defendant on the ground that the plaintiff had failed to establish the existence of the oral contract upon which this suit is based. The sole question here is the correctness of this judgment, in the light of the evidence adduced.

The plaintiff's evidence included his own testimony, a long series of correspondence between the parties, notes made by him of various conversations, and excerpts from the depositions of three other persons. At the trial, he testified that he was an oil man and a lawyer, with offices in New York. He said that he met the defendant Blair on January 19, 1950, when he was in Houston, and at that two-hour meeting, in Benton's room at the Lamar Hotel, the

parties made the oral contract on which he sues. He said that Blair wanted to exploit the possibilities for oil production in the Rankin area, a generally unattractive area of 12,000 to 14,000 acres about twenty miles northeast of Houston. He testified that Blair said that the major oil companies and the intelligent operators did not think well of its possibilities, and that Blair therefore thought it might be possible to make a better deal by getting the financing done in the East. The drilling of one well would not be enough, however. Blair wanted a rich man or a man with a large income tax who could spend a lot of money and gain tax deductions thereby, and "could be in one play after another." Benton testified that he and Blair then agreed that they would share equally the profits on any leases or royalties developed exclusively through drillings made by Benton's contacts on options or leases that Blair could obtain.

Benton testified that at the time the parties had in mind his client, Russell Maguire, "a wild, wild wildcatter with a lot of money to spend," who Benton said had described himself as "the most fabulous operator he [Maguire] knew." There was also discussed at this first meeting of the parties the terms of a specific deal, known as the first Gulf farmout, and Benton's notes on the meeting refer either exclusively to this deal or equally to this deal and the overall agreement.

Benton then submitted Blair's first deal to Maguire, who rejected it. In April or May, 1950, Blair went to New York, and Benton arranged a meeting between Blair and Maguire. They were unable to reach an agreement on any of Blair's promotions, however. Following this introduction, Blair and Maguire began to negotiate with each other directly, without Benton's intervention, although Blair continued to send various proposals to Benton for submission to Maguire, as well as to other potential investors of Benton's acquaintance. However, Benton encouraged Blair and Maguire to deal directly with one another, since Blair knew all of the details of the

proposals he was making. In some of the proposals forwarded to Benton for submission to his contacts, Benton's participation was specifically provided for, in terms different from those of the overall agreement. For example, in the so-called Grimes County deal, referred to below, the percentage was one-third. In others, nothing was said with regard to Benton's share.

As time went on, Blair and Maguire continued to negotiate more and more without Benton, and eventually without even informing Benton of the progress of their negotiations. (According to Maguire's deposition, he told Blair that Benton "could be of no help in negotiating trades with me.")

On February 23, 1953, Benton wrote to Blair that he had asked Maguire about a transaction that Blair and Maguire had been negotiating, while they were together in Palm Beach, Florida. The deal had fallen through, and Benton wrote that "he [Maguire] makes the point that you have nothing to offer." He stated further that Maguire had asked him for a letter "to the effect that if he makes a transaction on one or more of the properties you have submitted I would not look to him for compensation. I told him I would give him such a letter, upon my understanding that he would, naturally, deal through you, and that per the agreement between you and me in New York you would transfer me one-third of your net 'take'." In closing, Benton remonstrated with Blair for failing to keep him informed of the progress of the negotiations.

In answer to this letter, Blair telegraphed to Benton as follows:

"Dear Thad: I Offered You One Third Of My Net On Grimes Co. Deal If You Sold Same To Russell Maguire. You Failed To Sell Deal. Later In Warlits Office I Called Maguire And Put Him And Jack Little Together Little Failed To Sell Maguire Little Told Me They Had Traded Locally On Said Block Harrell Made Well Deal With Abercrombie Et Al On Gulf Portion I Had

And Now Drilling Bob Hotz Used Up Two Months Time On Grimes Deal And I Wasted Additional Thirty Days On You And Maguire Thereby Loosing 7700 Acre Consolidated Deal Water Over Dam If You Want To Pit Maguire On Notice Stay Out Of Yarboro And That Is Your Business. If You Expect Thirty Three And One Third Percent On Future Trades Between Me And Maguire Will Be Obliged To Stear Clear Of Him. My Expected Trip To New York Did Not Work Out Regards.

Francis Blair."

[Misspelling as in original.]

Benton testified that this telegram indicated to him that Blair was walking out on the overall agreement but that he "just couldn't believe it." He answered that "Your wire reflects a little feeling that I don't think is good for anybody; but perhaps I'm not reading it as well as I should—yet one can't be sure of what's between the lines not written." The letter again expressed the desire that Blair keep him informed regarding the progress of negotiations, and said that he "had a meeting with the Rockefellers the other day" regarding some transactions. Blair wired back in a somewhat more friendly tone. This telegram reads in part:

"Was Not Aware You Trading With Rockefeller Interest On Grimes."

The next correspondence between the parties was a letter from Benton to Blair, on May 25. It was partly in regard to a Mexican manganese transaction, but closed:

"Someone told me of some deals you made with Russell Maguire. May be it was not deals, but at least one deal. I thought he said several. What are they, and have any of them clicked yet? Let me know as fully as possible so that I may watch these plays; and please tell me when I'm going to get my million."

Blair answered three days later by forwarding to Benton a half interest in one of Blair's transactions covering leases in Jackson County. The letter expressed the hint that the feeling between Maguire and Blair was not good.

Benton answered by asking about the properties, which later turned out to be "substantially dead." Blair did not reply to the letter but telephoned Benton at the Mayflower Hotel, on July 20, when Benton was in Houston. Blair said that another well would be drilled in Jackson County. He said that Maguire had cheated him out of everything, leaving him out of all the deals in the Harris County block of leases. He said that in Union County he had a lease that Maguire wanted badly, and that Maguire had called him that day and threatened to sue if he didn't give Maguire the lease.

About July 24, Blair wrote to Benton about the new well on the Jackson County properties, adding, "My old Rankin area is getting active—maybe I will make some money yet." Benton answered on September 28 that he had heard that "you have hit that oil field, and that you should now be on the way to riches. I hope and pray that is so, and that you will send me the good news when confirmed." There was no reply.

On October 7, Benton received a call from Maguire, who asked him to come to Maguire's office. There Maguire showed him a map of the land west of the San Jacinto river in the Rankin field, depicting the two leases which are the major source of dispute here. Maguire then asked Benton for a written statement that on July 2, 1953, Blair had said that he was getting a lease together for Maguire. Maguire said that he had saved the Dooley-Scanlan lease by drilling a well there, because otherwise the lease would have reverted to the landowners. Maguire also said that Blair had signed a memorandum at Maguire's house on July 2, to the effect that the leases were Maguire's. Benton refused to give Maguire the statement he wanted.

On October 21, Benton's attention was drawn to an article in the *Houston Press* telling of success in the Crosby area, near the two leases in question. On October 30, Benton telephoned Blair from New York, and asked what had happened. Blair confirmed the story of success, adding that Maguire had sued him the day before, but that when they began to talk settlement, and Maguire produced a paper which Blair had allegedly initialed, Blair recognized it as a forgery. Blair then told Maguire that there would be "no compromise," that if Maguire sued he would "put him behind bars," and that to buy in he would have to pay "as much as the Houston people." Blair said that Maguire had doublecrossed him on six deals, but that this was "a new oil field." Benton asked, "What's in it for me?", and Blair answered that he would give Benton a part of the overriding royalty.

Later Benton called Blair again, about his interest, and early in November he went to Houston. Blair at that time denied owing Benton anything, and Benton thereafter brought this suit for fifty per cent of Blair's profits resulting from deals made as a result of Maguire's activities, which included the drilling of the well on the Dooley-Scanlan lease and the enhancement in value resulting therefrom to the contiguous Harris lease.

At the conclusion of Benton's testimony, as it is related above, and after the receiving in evidence of several documents and depositions, Blair moved for judgment under Rule 41(b) of the Rules of Civil Procedure, 28 U.S.C.A. The court granted the motion "on a fact-finding in favor of the defendant." It said:

"I am simply unable to accept as true the plaintiff's version that on the first time he met the defendant Blair in a two-hour conversation they made a contract, an oral contract, of the terms and tenor that the plaintiff contends for, and upon which he bases his action and which he is now seeking to enforce. * * * And the plaintiff's contention simply because he introduced the defendant Blair to Maguire—had nothing to do with selling or financing this particular trade made the basis of this litigation—that just because he had brought the parties together some three years before in connection with other trades, that he had a contract that would reach a one-half or even a lesser interest in this one, I am simply unable to accept."

Thereafter, upon making formal findings of fact in defendant's favor, it entered judgment denying the plaintiff all relief.

■ The defendant correctly asserts that on a motion made under Rule 41(b), the judge, when sitting without a jury, must weigh and evaluate the evidence in the same manner as if he were making findings of fact at the conclusion of the entire case. The Rule also provides that these findings of fact shall be made "as provided in Rule 52(a)", and the defendant validly reasons that since Rule 52(a) states that findings of fact shall not be set aside unless clearly erroneous, that test must apply in our review of the district court's findings in this case. Allred v. Sasser, 7 Cir., 170 F.2d 233.

■ The question remains, however, whether it was clearly erroneous for the district court to reject the uncontradicted and unimpeached testimony of the only witness presented at the trial until that time, on the ground that the witness's version of the contract in question was too implausible to be accepted. As we view the law, unless Benton's testimony was inherently incredible, the district court committed plain error in rejecting it.

The rule is illustrated in Quock Ting v. United States, 140 U.S. 417, 11 S.Ct. 733, 35 L.Ed. 501, and Chesapeake & O. R. Co. v. Martin, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983. In Quock Ting v. United States, the petitioner arrived in San Francisco aboard a steamship from China in February, 1888. The customs officials refused to allow him to land, on the ground that he was a subject of the emperror of China, and barred by the Chinese Exclusion Act of 1882. He ap-

plied for a writ of habeas corpus, alleging that he was a native-born citizen of the United States. The writ was issued, and he and a resident of San Francisco, allegedly his father, were the only witnesses before the court.

He testified that he was sixteen years old, had been born in San Francisco "on Dupont Street, upstairs" and had remained in San Francisco until he was ten years old, when he returned to China with his mother. Beyond naming three men on board the ship that took him back to China, that was his only recollection of his life here. He was unable to speak a single word of English, and did not know any places or streets in San Francisco.

The person alleged to be his father then took the witness stand, and corroborated the story. He also produced what he called his "store-book," in which he had entered the purchase of a ticket for the boy and his mother back to China. He gave no particulars of his residence in San Francisco, and could name no one who knew him as having a wife or children. The court then discharged the writ, and ordered that the petitioner be remanded to the marshal to be returned to the captain of the steamship, on the ground that he was a Chinese citizen. An appeal was taken directly to the Supreme Court, which affirmed. Mr. Justice Field, speaking for the Court, stated the rule as follows:

> "Undoubtedly, as a general rule, positive testimony as to a particular fact, uncontradicted by any one, should control the decision of the court; but that rule admits of many exceptions. There may be such an inherent improbability in the statements of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting testimony." 140 U. S. 417, 420, 11 S.Ct. 733, 734, 35 L. Ed. 501.

The Martin case presented the same issue on a demurrer to the evidence. There the railroad misdelivered a car-load of the shippers' potatoes, and when the potatoes were finally found, they had spoiled. At the trial, after both sides rested, the railroad demurred to the evidence on the ground that the action was barred because the claim for loss had not been made "'within six months after a reasonable time for delivery [had] elapsed.'" [283 U.S. 209, 51 S.Ct. 454.] The undisputed evidence was that the claim had been made six months and twenty days after the shipment. The railroad's Richmond, Virginia freight agent testified that a reasonable time for delivery from the point of shipment to Richmond, the destination, would be eight days. This testimony was not contradicted, but the demurrer was overruled. The jury thereafter found for the shippers, the trial court entered judgment in accordance with its verdict, and the Virginia Court of Appeals affirmed. 154 Va. 1, 143 S.E. 629, 152 S.E. 335. The Supreme Court reversed.

The Court said that a demurrer to the evidence must be tested by the same rules as are applicable to a motion for a directed verdict, thus resolving all conflicts in evidence in favor of the shippers. It added, however, that

> "The court, as will be shown, is not at liberty to disregard the testimony of a witness on the ground that he is an employee of the defendant, in the absence of conflicting proof or of circumstances justifying countervailing inferences or suggesting doubt as to the truth of his statement, unless the evidence be of such a nature as fairly to be open to challenge as suspicious or inherently improbable." 283 U.S. 209, 214, 51 S.Ct. 453, 455, 75 L.Ed. 983.

See also Foran v. Commissioner of Internal Revenue, 5 Cir., 165 F.2d 705.

We find nothing in the plaintiff's case here which renders suspicious or inherently improbable his assertions that an oral contract was made between the parties for an equal sharing of the profits of deals made by Blair with Benton's contracts. The defendant asserts that there

are several aspects of Benton's testimony which make dubious his account of the initial meeting of the parties. One of these is the fact that Benton, a lawyer, never thought it necessary to reduce the overall agreement to writing, either in a formal contract or in the stenographic notes which he frequently made of important conversations. In reviewing the conduct and dealings of the three most important participants in the events out of which this suit arose, it does seem to have been inadvisable for any of the three to have made undertakings of any significance with either of the others without obtaining a written confirmation of the terms. However, we cannot fairly say that there is anything inherently improbable in two businessmen, even on first acquaintance, making such an oral agreement, and relying on personal honor—or "mutual trust and confidence," as Benton so often put it—as the only sanction of enforcement. Moreover, we see nothing suspicious in Benton's not making stenographic notes regarding the contract, for he did not take notes on every conversation, and took incomplete notes on those conversations of which he saw fit to record part. In short, these jottings seem mainly a personal reminder of details most likely to escape recollection, and were in no sense even summarily comprehensive of any particular agreement.

The defendant also argues that Benton's failure to demand specifically one-half of Blair's profits on any transaction, until he had finally decided to bring suit, and his language in his letter to Blair on February 23, 1953, are strong evidence that the agreement was not as he alleges it to be. We find nothing in this letter, the pertinent excerpts of which are set forth above, which negatives the existence of the contract. Nor does Benton's use of general language in asking about his participation, such as "please tell me when I'm going to get my million" or "What's in it for me?" indicate that the arrangement contemplated only a moral obligation on Blair's part. It is undisputed that Blair did not keep Benton informed of the various proposals he was making to Maguire, and since Benton did not know what Blair's share in these transactions was, he could not know what his own half thereof would be.

On the other hand, the evidence shows that although Maguire had a low regard for both Benton's business acumen and his usefulness as an intermediary, he nevertheless thought it necessary to obtain assurances from both Benton and Blair that whatever Benton was to get for his services as a go-between would come from Blair and not from him. It is also significant that Blair answered that he, Blair, would "take care of" Benton. Similarly, when Benton began to ask about a "deal" or "deals" that Blair had made with Maguire, Blair answered by forwarding to Benton a half of his interest in the Jackson County transaction, although the "play" was by that time "substantially dead." Finally, in regard to Blair's February 27 telegram to Benton, wherein he stated that if Benton expected participation in any future trades with Maguire, Blair would have to steer clear of him, it will be observed that Blair's subsequent communications (including the Jackson County transaction) reflected a different attitude when Benton remonstrated with him for this language and mentioned that he had "had a meeting with the Rockefellers the other day."

Perhaps the strongest circumstance supporting Benton's contention is Blair's clearly implied admission in this telegram that if he made any "future" trades with Maguire, Benton would have a claim against him. He said: "If you expect thirty three and one third percent on future trades between me and Maguire will be obliged to stear [sic] clear of him." In spite of such statement he, of course, did not steer clear of him, but worked actively to make a deal, which he did a few months later. It is this deal that Benton says he is entitled to share in.

■ The defendant urges that if Benton's testimony is not inherently improb-

able or suspicious in itself, it is deemed so as a matter of law because he is also a party to this suit. For this proposition he cites Sonnentheil v. Christian Moerlein Brewing Co., 172 U.S. 401, 19 S.Ct. 233, 43 L.Ed. 492. That case drew in question an allegedly fraudulent transfer made by an insolvent to certain of his creditors. The issues involved included both the acceptance and the bona fide character of the transfer. The unimpeached and uncontradicted testimony of several of the creditors was that they had accepted the transfer. Noting that "there is no class of cases which are more peculiarly within the province of the jury than such as involve the existence of fraud", the Court held that both the issue of acceptance and the issue of intent were properly submitted to the jury, since "the question of fraud was so connected with that of acceptance that it was possible for the jury to have found that the accepting creditors had knowledge of the fraud at the time of their acceptance." 172 U.S. 401, 410, 408, 19 S. Ct. 233, 236. Because of the particular facts in this case and the language of the Court, we do not induce from it the broad principle that a party's own testimony is deemed to be inherently improbable or suspicious.

■ We thus hold that it was clearly error for the district court to reject the uncontradicted, unimpeached and not inherently improbable or suspicious testimony of Benton, and remand the case for a further trial of the issues. In so holding, we do not mean to suggest any conclusions regarding the weight of the plaintiff's testimony or his other evidence, should they be contradicted by other evidence, either direct or circumstantial, including reasonable inferences therefrom. We hold only that it was incorrectly rejected at the first trial because it was credible in itself and at the time of the defendant's motion stood uncontradicted either by inconsistencies within itself or conflicting evidence from the defendant. It was sufficient to make a prima facie case as to the existence of a contract.

Reversed and remanded.

In remanding the case to the trial court for a further trial of the issues we do not express an opinion as to whether other grounds of recovery are sufficiently pleaded or proved by plaintiff. These matters should be passed upon in the first instance by the trial court before which the case stands as it did before the first trial, with both parties having the benefit of the liberal policy relating to the nature of relief available, and the right to amend and offer proof as announced in Rules 54(c) and 15(b) of the Federal Rules of Civil Procedure.