**George L. GIARD, Plaintiff**

v.

**Harvey J. DARBY and C.R. England, Inc., Defendants**

**No. CIV.A.03–30044–KPN.**

United States District Court, D. Massachusetts.

March 8, 2005.

---

Robert C. Sacco, Lyon, Ferriter & Fitzpatrick, Holyoke, MA, for Plaintiff.

Ann Elizabeth Cascanett, Morrison, Mahoney, & Miller LLP, Lee S. MacPhee, Morrison Mahoney LLP, Boston, MA, for Defendants.

*MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION FOR A NEW TRIAL (Document No. 73)*

NEIMAN, United States Magistrate Judge.

On January 14, 2005, after a one week trial, a jury entered a verdict favorable to George L. Giard ("Plaintiff") in this personal injury action. The jury found Harvey J. Darby ("Darby") and Darby's employer, C.R. England, Inc. ("C. R. England") (together "Defendants"), liable to Plaintiff in the amount of $650,000. On January 24, 2005, the court, after calculating interest, entered judgment against Defendants in the amount of $803,299.84. Presently before the court is Defendants' Motion for a New Trial, filed pursuant to Fed.R.Civ.P. 59(a). In essence, Defendants assert that the jury verdict was contrary to the weight of the evidence, that "pernicious error" intruded into the trial, and that the damages awarded were excessive. For the reasons which follow, the court will deny Defendants' motion.

I. BACKGROUND

This background is sketched in a light most favorable to the jury's verdict. *See O'Connor v. Huard,* 117 F.3d 12, 14–15 (1st Cir.1997). A car driven by Plaintiff and a tractor trailer owned by C.R. England and operated by Darby collided on January 28, 2000, at approximately 7:40 p.m. on Routes 5 and 10 in Whately, Massachusetts. The accident occurred near the Whately General Store. Giard was traveling south when Darby attempted to enter the highway from the store to head north. The front of Giard's car collided with the tractor portion of the tractor trailer near the gas tank. Neither Plaintiff nor Darby

saw the other's vehicle immediately prior to the collision. Plaintiff was seriously injured; Darby was not.

Officer Robert Fisher of the Whately Police Department immediately responded to the scene and spoke with both Darby and Plaintiff. He later met them again at the hospital. As a result of his investigation, Officer Fisher cited Darby for failure to use care in turning and failure to use care in starting.

Darby testified that he had been traveling south on Routes 5 and 10 when he pulled into the store's parking lot to obtain directions to the Yankee Candle warehouse. Adele Corcoran, part owner of the store, advised Darby that he needed to turn around and go north, but should not turn north out of the parking lot; rather, he should travel south to where there was adequate room to make a u-turn. Instead of following these directions, Darby attempted to go north as follows: he pulled the tractor trailer out across the road, reversed back into the parking lot and then began to exit the lot again. It was then that the collision occurred. At the time, there was a tree, a sign, as well as some brush along the side of Routes 5 and 10 which possibly, if not likely, blocked Darby's view.

Plaintiff admitted to having had one beer in the hour or two prior to the accident. Officer Fisher detected no alcohol on Plaintiff's breath during the course of his investigation. However, a laboratory test performed approximately two hours after the accident revealed that Plaintiff had a .05 blood alcohol count. Defendants presented an expert, Laura Green, Ph.D., who opined that Plaintiff's blood alcohol level at the time of the accident ranged anywhere between .06 and .08. She further opined that Plaintiff had consumed approximately 3⅔ 12 oz. containers of beer and that the driving ability of a person of

Plaintiff's size who had consumed as much would have been impaired at the time of the accident.

Dr. David Pesuit, an accident reconstruction expert, testified on Plaintiff's behalf. His analysis focused on the amount of time that the tractor trailer driven by Darby was located within the southbound travel lane of Routes 5 and 10 in which Giard was driving. He opined that the truck was in that lane for approximately 1.38 seconds and that Plaintiff could not have reacted in sufficient time to stop or otherwise avoid a collision. When comparing the damage to the respective vehicles, Dr. Pesuit also opined that, at the time of impact, Plaintiff's vehicle was traveling at approximately 40 miles per hour within a ten mile per hour differential.

Darby's employment was terminated soon after the accident because C.R. England determined that the collision was "preventable" in accord with its employment policies. As for Plaintiff, he was released from the hospital on the evening of the accident, but returned the next day coughing up blood and complaining of chest pain. Approximately three months later, Plaintiff went to see a Dr. Arnould complaining of pain in his lower back and left leg.

Drs. Charles Mick and Saavas Papazaglou, both of whom treated Plaintiff for his injuries, testified that, as a result of the accident, Plaintiff had a herniated disc at the L4 and L5 levels which compressed the nerve roots between the L5 and S1 levels. Surgery in May of 2000 alleviated the herniation, but the damaged nerve root failed to repair itself. Plaintiff now has limited use of his left leg and will be required to use a brace for the rest of his life.

Craig Moore, Ph.D, an economist, also testified on Plaintiff's behalf. Based on

Plaintiff's age and inability to continue in his prior profession as a carpenter/contractor and Plaintiff's representations regarding his average yearly income, Dr. Moore opined that the present value of Plaintiff's lost earning capacity exceeded $736,000.

In addition to his own testimony, Plaintiff offered testimony from Margaret Sysko, a friend with whom he resides, and his sister, Patricia Reynolds, as to the pain and suffering he has experienced as a result of the accident. In sum, these witnesses testified that Plaintiff is unable to walk, sit or stand without significant discomfort. In addition, they testified that Plaintiff has difficulty sleeping, continues to have severe pain in his lower back and, as indicated, has not regained full use of his left leg.

## II. DISCUSSION

Fed.R.Civ.P. 59(a) provides in pertinent part that "[a] new trial may be granted to all or any of the parties and on all or part of the issues ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." The Supreme Court has described the scope of the rule as follows:

> The motion for a new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.

*Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940). *Accord Cigna Fire Underwriters*

*Co. v. Macdonald & Johnson, Inc.*, 86 F.3d 1260, 1262–63 (1st Cir.1996).

Here, Defendants argue that a new trial should be granted for three reasons: (1) the verdict is against the weight of the evidence; (2) there were errors in the admission of certain evidence, in particular the testimony of Dr. Pesuit; and (3) that the damages awarded were excessive. The court considers each argument in turn.

### A.

With regard to Defendants' first argument, as the parties are well aware, "[a] district court may set aside a jury's verdict and order a new trial only if the verdict is so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice." *Federico v. Order of Saint Benedict*, 64 F.3d 1, 5 (1st Cir. 1995). That is simply not the case here. Rather, there was more than ample evidence, as detailed above, for the jury to have reasonably found Defendants liable to Plaintiff in negligence. The court also believes that the jury could have reasonably found that Defendants failed to sustain their burden of proof with respect to the affirmative defense of comparative negligence. In essence, the jury easily could have determined that Darby negligently operated his tractor trailer when he attempted to redirect it in a northerly direction and by darting out into the roadway to accomplish that task.

To be sure, Defendants make much of the fact that the tractor trailer was large, had running lights and conspicuity tape and should have been seen, if not anticipated, by Plaintiff. However, in the court's opinion, the jury could have readily found, based on the evidence, that Plaintiff did not see and could not have anticipated the tractor trailer. Moreover, the jury could have reasonably found that Darby himself

understood the danger of attempting to proceed north out of the store's parking lot (he actually walked across the road before attempting the procedure) contrary to the request made by the store's owner. In addition, the jury properly could have considered the traffic citations which Darby, but not Giard, received.

The jury could also reasonably have found that Plaintiff was not a contributing cause of the accident. Indeed, as the court recalls, Defendants did not even raise comparative negligence in their closing arguments, even though the court instructed the jury on that defense and included comparative negligence questions on the special verdict form. As Plaintiff now argues, it is sheer speculation on Defendants' part that the accident would not have occurred had Plaintiff seen the tractor trailer at the last moment. To repeat, the jury could have reasonably concluded that the tractor trailer driven by Darby was not visible to Plaintiff before it suddenly entered the roadway.

Finally, Defendants have failed to convince the court that Plaintiff's injuries were not causally connected to the collision. The testimony of the treating surgeons provided more than adequate explanations of the relationship between Plaintiff's injuries and the impact occasioned by the collision. Their testimony also explained the passage of time between Plaintiff's re-visiting the hospital soon after the accident and his not seeking further medical help for another three months.

In sum, Defendants have failed to convince the court that the jury reached a "seriously erroneous result" with respect to either liability or comparative negligence, *see Borras v. Sea–Land Service, Inc.*, 586 F.2d 881, 887 (1st Cir.1978), or that any "compelling circumstances" exist calling for a different result, *see Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 811 (1st Cir.1988). *See also Foisy v. Royal Maccabees Life Ins. Co.*, 356 F.3d 141, 146 (1st Cir.2004) (noting that motion for new trial should be granted "only if the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice") (citation and internal quotation marks omitted). The jury's verdict was not against the weight of the evidence and the court will not order a new trial on that basis.

## B.

Defendants center their second argument on the court's admission of Dr. Pesuit's testimony. In essence, Defendants repeat the argument they pursued prior to trial, namely, that Dr. Pesuit's opinions ought not have been admitted as scientific or technical evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), as clarified by *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), and Fed.R.Evid. 702. Again, the court finds Defendants' argument unpersuasive.

As the court explained in its pre-trial ruling, Federal Rule of Evidence 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In turn, *Daubert* requires the court to determine whether the proffered expert evidence is both reliable and relevant. The reliability of the evidence involves a four-part inquiry, *i.e.,* whether the challenged theory or technique: (1) can be tested; (2) has been subject to peer review; (3) has a known error rate; and (4) has been generally accepted in the relevant scientific community. *Id.,* 509 U.S. at 591–95, 113 S.Ct. 2786. As for relevance, the court has to decide whether the evidence will assist the jury in determining the existence of any fact of consequence. *Id.* at 591–93, 113 S.Ct. 2786.

In *Kumho Tire,* the Supreme Court concluded that "*Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire,* 526 U.S. at 141, 119 S.Ct. 1167 (quoting Fed.R.Evid. 702). The Court also concluded "that a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability." *Id.* (emphasis in original). The Court cautioned, however, that "as . . . stated in *Daubert,* the test of reliability is 'flexible' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* "Rather," the Court continued, "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142, 119 S.Ct. 1167 (citation omitted).

■ Dr. Pesuit holds a doctoral degree in chemical engineering from Yale University, belongs to the American Institute of Mechanical Engineers—Safety Division, was an adjunct professor in the Department of Mechanical Engineering at the University of Massachusetts in Amherst, and is the president of the Accident Analysis Group (formerly D.R. Pesuit & Associates). Since the 1980s, Dr. Pesuit has testified in at least eighty actions, reconstructing explosions, failures, fires, and vehicular accidents, and, reportedly, has never been disqualified as an expert. In the instant case, Dr. Pesuit has based his opinion on, among other factors, two site visits, photographs, deposition testimony, and truck dimensions.

Notwithstanding these qualifications, Defendants continue to assert that Dr. Pesuit's testimony, even if relevant, was unreliable. Specifically, Defendants repeat that Dr. Pesuit is a chemical, not a mechanical, engineer, with no formal education or "certification" in motor vehicle accident reconstruction. Defendants also argue, again, that many of the prior cases in which Pesuit has testified involved topics not relevant to motor vehicle accident reconstruction.

Preliminarily, it is worth repeating that the parties thoroughly briefed this matter prior to trial, attached the appropriate exhibits and *curriculum vitae,* and did not request a pretrial hearing. Nonetheless, the court permitted an extensive *voir dire* of Dr. Pesuit prior to his testifying. In addition, the court instructed the jury that they should give the expert opinions only "such weight as [they] think they deserve" and that they should "disregard [an] expert's opinion in whole or in part" should they determine that the opinion "is not based upon sufficient education and experience, or . . . that the reasons given in support of the expert's opinions are not sound, or that the opinions are outweighed by other evidence." (Jury Instructions (Document No. 70), No. 16.) There were no objections to these instructions.

■ The court remains unpersuaded by Defendants' assessment of Dr. Pesuit's

qualifications. For one thing, as Plaintiff has argued, it appears that no accredited university offers formal education in motor vehicle accident reconstruction. More to the point, Dr. Pesuit's engineering background and experience enabled him to apply basic physics to form his opinions in the case at bar. *See Ford v. Nationwide Mut. Fire Ins. Co.*, 62 Fed.Appx. 6, 2003 WL 1825724 (1st Cir.2003) (unpublished) (no abuse of discretion in allowing accident reconstruction expert to testify in circumstances similar to those here). Moreover, Dr. Pesuit explained all the variables in his calculations and Defendants had the opportunity to challenge his assumptions through cross examination. As the First Circuit has explained, *Daubert* "demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a substantially sound and methodologically reliable fashion." *Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir.1998). Defendants, by the way, offered no competing expert.

The court is also unpersuaded by Defendants' second set of arguments: that Dr. Pesuit improperly relied on a visual comparison of photographs to determine the vehicles' speed; that his conclusions were based on impermissible assumptions; and that the studies upon which he based these conclusions were unreliable. To be sure, Dr. Pesuit used photographs to support his conclusions, but he also relied on depositions and police reports and visited the accident site several times. *See Clark v. Chrysler Corp.*, 310 F.3d 461, 470–71 (6th Cir.2002) (expert's opinion reliable where it was "based in part on his examination of [the] truck, the accident scene, the police report, the photographs and the depositions in the case"), *vacated on other grounds*, 540 U.S. 801, 124 S.Ct. 102, 157

L.Ed.2d 12 (2003). *See also Quintana–Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62, 65 (1st Cir.2002) (noting that defendant's accident reconstruction expert, apparently without objection, determined vehicle's speed before driver applied brakes based solely "on the damage sustained by the [car] ... and the length of the skid marks"). And as mentioned, Defendant had the opportunity to call their own expert and vigorously challenge Dr. Pesuit's testimony before the jury. *See Daubert*, 509 U.S. at 596, 113 S.Ct. 2786 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

In a final effort, Defendants argue that Dr. Pesuit's testimony was "the sole offer of proof as to [their] negligence." Nothing could be further from the truth. Even if the jury were to have ignored Dr. Pesuit's testimony, there was more than enough evidence remaining upon which it could have rested its verdict. As Plaintiff argues, the evidence—including the testimony of Darby himself, Plaintiff, Officer Fisher and Ms. Corcoran, as well as photographs of the accident scene—could have revealed to a reasonable jury that Darby negligently pulled his vehicle onto a dark roadway without having made sure that he had a clear right of way.

### C.

Finally, Defendants contend that a new trial is warranted because of "excessive" damages. The court disagrees.[1]

■ As Defendants well know, their burden in pursuing a claim of excessive damages is high, one they themselves describe as "shaking the conscience" or "grossly excessive." *See Acevedo–Garcia*

---

1. Interestingly enough, Defendants have not sought a remittitur.

*v. Monroig,* 351 F.3d 547, 565 (1st Cir. 2003). That is hardly the situation here. Dr. Moore, Plaintiff's economics expert, who also was subject to vigorous cross-examination, testified that the present value of Plaintiff's lost earning capacity exceeds $736,000, a particularly measurable economic loss. Not only did the jury come in with a figure less than that, but the verdict could have properly included damages for unpaid medical expenses as well as pain and suffering. (See Jury Instructions at Nos. 36–45.) In this regard, Plaintiff's testimony with regard to pain and suffering, together with supporting testimony by Ms. Sysko and Ms. Reynolds, was particularly telling. Accordingly, it can hardly be argued that the jury's assessment was speculative or "the result of passion, prejudice or caprice." *Lux v. McDonnell Douglas Corp.,* 608 F.Supp. 98, 105 (N.D.Ill.1984), *reversed and remanded on other grounds sub nom. In re Air Crash Disaster Near Chicago,* 803 F.2d 304 (7th Cir.1986).

Still, Defendants attempt to compare Plaintiff's $650,000 award with other jury awards emanating from this division. Defendants' sole support for this type of argument is *Levka v. Chicago,* 748 F.2d 421 (7th Cir.1984), in which the Seventh Circuit stated that a court may consider whether an award "is out of line compared to other awards in similar cases." *Id.* at 425. *See also Ismail v. Cohen,* 899 F.2d 183, 187 (2nd Cir.1990) ("Reference to other awards in similar cases is proper."). At least one circuit court has held to the contrary, *see Vanskike v. Union Pacific R. Co.,* 725 F.2d 1146, 1150 (8th Cir.1984) ("[Damages] comparisons are not greatly helpful because the case must be evaluated as an individual one, within the framework of its distinctive facts."), while others have been more nuanced, *see Shaw v. United States,* 741 F.2d 1202, 1209 (9th Cir.1984) ("[W]hile each case stands on its own facts[,] . . . courts are required to maintain some degree of uniformity in cases involving similar losses."); *Wilson v. Beebe,* 743 F.2d 342, 348 (6th Cir.1984), ("[While] similar cases should not be relied upon by a fact-finder when determining the amount of a plaintiff's damage award[,] . . . analogous cases may be reviewed at the post-trial or appellate stage to determine whether a damage award is within a given range."), *vacated on other grounds,* 770 F.2d 578 (6th Cir.1985).

■ For its part, the First Circuit has "eschewed comparisons to other cases in evaluating the validity of a jury's award and [has] instead relied upon the specific evidence at hand." *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 579 (1st Cir. 1989) (upholding $4.5 million compensatory damages award) (citing cases). "The paramount focus in reviewing a damage award," the First Circuit stated, "must be the evidence presented at trial." *Id.* (citing *Wheat v. United States,* 860 F.2d 1256, 1259–60 (5th Cir.1988)). To be sure, the court explained, comparisons may be of some use "where there are a series of similar cases arising out of the same context that are tried in the same locale." *Id.* However, "the value of any comparison will depend upon the similarities of the injuries, the locations and dates of the trials, and of the evidence presented there." *Id.*

Here, the other federal awards cited by Defendants hardly arose in similar, comparable cases. *Compare Levka,* 748 F.2d at 425 (comparing plaintiff's award to "the nine [other] damage suits against the City of Chicago by women who were subjected to unconstitutional strip searches"). One was a product liability matter and the other an employment discrimination case, both of which, by the way, had jury verdicts in excess of the amount of damages

awarded here. The state court verdicts mentioned by Defendants are similarly inapposite. The only other figure Defendants cite arose out of a settlement, hardly an appropriate comparison.

As it happens, the First Circuit's comment in a decision upholding a $150,000 verdict nearly fifty years ago resonates today: "There can be no doubt that the plaintiff was seriously, painfully and permanently injured, that his future earning capacity is gone or, at the least, seriously impaired, and that his suffering was long and severe and the end of it is not yet in sight." *Turner Construction Co. v. Houlihan*, 240 F.2d 435, 440 (1st Cir.1957). At bottom, the testimony adduced at trial demonstrates beyond cavil that $650,000 was not excessive, but quite reasonable in light of all the evidence.

### III. CONCLUSION

For the reasons stated, Defendants' motion for a new trial is DENIED.

IT IS SO ORDERED.